Allen R. CASE, and Emma Case, Plaintiffs,

v.

The UNITED STATES DEPARTMENT OF AGRICULTURE and John R. Block, individually, and the Department of Agriculture of the Commonwealth of Pennsylvania and Penrose Hallowell, individually, James O. Lee, Jr., individually, Dr. Max A. VanBuskirk Jr., individually, Dr. G.J. Fichtner, individually, Defendants.

Civ. A. No. 85–1021.

United States District Court, M.D. Pennsylvania.

Sept. 4, 1986.

Daniel M. Pell, York, Pa., for plaintiffs.

Sally A. Lied, Asst. U.S. Atty., Harrisburg, Pa., for defendants.

Thomas B. York, Deputy Atty. Gen., Harrisburg, Pa., for Dept. of Agriculture.

MEMORANDUM

CALDWELL, District Judge.

I. *Introduction and Background.*

The defendants have filed motions for summary judgment. Plaintiffs' complaint arises from a quarantine imposed on certain counties in Pennsylvania by the state and federal governments following an outbreak of avian influenza. Plaintiffs oper-

ate a hatchery in one of the counties. The complaint alleges violations of several constitutional rights guaranteed by the fifth and the fourteenth amendments. Specifically, plaintiffs claim a taking of their property without just compensation, a due process violation and an equal protection violation. The claim against the federal defendants is a *Bivens*-type claim [1] made directly under the fifth amendment. The claim against the state defendants, although not specifically set forth, would be under the fourteenth amendment by way of 42 U.S.C. § 1983.

The extent and duration of the quarantine as it applied to plaintiffs is not in dispute.[2] Their hatchery, "Case Farm Hatchery" is located in Brodbecks, York County, Pennsylvania. After the discovery of the influenza virus, the federal and state governments, through the United States Department of Agriculture and the Pennsylvania Department of Agriculture, imposed a quarantine on certain areas of York County on November 16, 1983. Thereafter, other areas of the county were added as the virus was monitored. Plaintiffs came within the quarantine on December 27, 1983, when a highly pathogenic form of the virus was discovered on a farm about fifteen miles away.[3] Plaintiffs' flocks, however, were never shown to have been infected and were never destroyed or depopulated. Nevertheless, the quarantine regulations imposed the following restrictions on plaintiffs' business activities. Plaintiffs were permitted to move poultry eggs for use as food which came from poultry not exposed to highly pathogenic influenza interstate and intrastate from the quarantine area, provided certain security conditions were met. They could also ship day old poultry inside the quarantine zone and were also permitted to buy hatching eggs outside the quarantine zone, hatch them on plaintiffs' premises, and sell the

birds outside the zone but inside Pennsylvania. The quarantine on the plaintiffs was lifted on June 7, 1984. Other portions of York County were released from quarantine on July 27, 1984.

Significantly, the plaintiffs' business does not consist simply of selling table eggs and poultry for food. Rather, they almost exclusively hatch chickens, ducklings, guinea keets, turkey poults and game birds, and sell them as day olds. Ninety-five per cent of plaintiffs' business consists of selling day old birds via the mail to small backyard flock owners in the continental United States and occasionally Alaska, Hawaii and Puerto Rico. Five per cent of their business comes from the sale of table eggs, hatching eggs, books, poultry supplies and equipment. Plaintiffs purchase their breeding stock a year in advance so that they had incurred ninety per cent of their costs before the quarantine was imposed upon them. Their business is seasonal with the vast majority of it occurring between March and June each year.

## II. *Discussion.*

### A. *Plaintiffs Have Failed to Set Forth a Valid Claim For a Taking Without Just Compensation.*

■ The fifth amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Recent cases have set forth the standard to be used in determining whether a taking under the fifth amendment has occurred. Three significant factors are to be considered: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guaranty Corp.,* ——

1. *Bivens v. Six Unknown Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. For the purposes of the motions, we will accept as true plaintiffs' allegations under the well established standard for ruling on motions for summary judgment. *See Arnold Pontiac-GMC,*

*Inc. v. General Motors Corp.,* 786 F.2d 564 (3d Cir.1986).

3. Avian influenza can range from an asymptomatic form to a lethal variety which can kill 70 to 80 per cent of a flock. (Commonwealth defendants' statement of undisputed facts at ¶¶ 3, 5).

U.S. ——, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) and cases cited therein. *See also Keystone Bituminous Coal Association v. Duncan,* 771 F.2d 707 (3d Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 1456, 89 L.Ed.2d 714 (1986). The Supreme Court has also emphasized, however, that there is no "set formula for identifying a 'taking' forbidden by the Fifth Amendment." *Connolly, supra* at ——, 106 S.Ct. at 1026, 89 L.Ed.2d at 178–79. Instead, an *ad hoc* factual inquiry into the circumstances of each particular case is necessary.

The federal and state defendants, although filing separate motions and briefs, have essentially made the following common argument that no taking has occurred in the circumstances of this case. First, they emphasize that the governmental actions in this case were taken in the public interest and were valid exercises of the police power to protect the public health and welfare. The defendants point to the importance of the poultry industry to the nation's economy (Affidavit of Dr. Max A. Van Buskirk, ¶ ¶ 24–26) and the need as well to prevent avian influenza from spreading to other states. (Affidavit of Gerald J. Fichtner, ¶ 12). Under similar circumstances in the past, the Supreme Court has found the governmental actions constitutional and has rejected fifth amendment due process claims.

Second, defendants argue that, in any event, no taking has occurred here because, at most, plaintiffs were denied only one use of their property—sale of day old birds interstate, and intrastate outside the quarantine area. Plaintiffs were still able to use their property in accordance with the restrictions set out above. Defendants rely upon those cases which have viewed a plaintiff's interest, as a "bundle of property rights" and when only one "strand" of the bundle has been destroyed, there has been no taking. *See Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Finally, the state defendants argue that the character of the governmental action overcomes the plaintiffs' claim that a nine-ty-five per cent drop in sales effectively constitutes a taking of all their property rights in their breeding stock and hatchery business. This argument is tied into plaintiffs' reasonable expectations as to how the property may be used. The governmental action here was designed to further the public interest. "Since a property owner's reasonable expectations as to the possible uses of his property are always circumscribed by the limitations on its use that may be imposed by the state in the public interest," *Keystone Bituminous, supra,* 771 F.2d at 716–17, there can be no claim here that a taking has occurred regardless of the severity of the economic impact upon plaintiffs.

Plaintiffs argue that the validity, or lack thereof, of the exercise of the police power is irrelevant to the taking analysis. The emphasis should simply be on whether there has been a taking without just compensation. Discussing several Supreme Court cases, along with the *Keystone Bituminous* case, *supra,* and *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893 (F.Cir.1986), plaintiffs contend that the following considerations lead to the conclusion that a taking has occurred. First, the quarantine effectively denied plaintiffs the one viable economic use of their property, the sale of live chicks and other birds. Second, although there was no physical invasion of the property, there was an interference equivalent to such an invasion because plaintiffs' right to own breeding stock and produce hatching eggs meant nothing when plaintiffs could not ship interstate. Third, plaintiffs' business decreased in value 95 per cent. Finally, there was a frustration of reasonable, investment-backed expectations because plaintiffs had incurred ninety per cent of their costs before the quarantine was imposed on them and were fully expecting to conduct business as usual before defendants effectively shut them down.

The strongest factor in plaintiff's favor is the economic impact of the regulations upon them. They allege, and we must accept as true, an estimated 95 per

cent diminution in sales during the quarantine which effectively destroyed plaintiffs' business during their normal selling season. But diminution in value alone does not establish a taking. *See Penn Central, supra; Keystone Bituminous, supra.* Of paramount importance in the instant case is that the governmental action was the promulgation of regulations designed to promote the general welfare rather than specific conduct narrowly focused on certain property. *See, e.g., United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed.2d 1206, 6 Ct.Cl. 343 (1946). This fact affects our analysis under the remaining two factors and we conclude that, in light of those factors, no taking has occurred here.

Plaintiffs cannot complain that the governmental conduct interfered with reasonable, distinct investment-backed expectations. In *Keystone Bituminous, supra,* plaintiffs challenged a Pennsylvania law placing limitations on their right to mine coal. In discussing plaintiffs' reasonable expectations, the Third Circuit Court of Appeals stated:

> In the present appeal, however, the statute at issue is clearly designed to serve broad and legitimate *public* interests. The ownership of the support estate does not afford a mine operator a reasonable expectation to profit at the expense of the public at large, but only at the expense of the surface owner with whom it contracted. Likewise, ownership of the surface estate does not give a landowner the right to waive away rights of support if the legislature deems them necessary for the public good. Just as coal mining activities may be restricted when they intrude upon the interests of adjacent owners, or the holders of water rights, police power may be invoked to protect the public. Thus, a property owner's reasonable expectations as to the possible uses of his property are always circumscribed by the limitations on its use that may be imposed by the state in the public interest. "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals,

or safety of the community, cannot in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Goldblatt [v. Town of Hempstead],* 369 U.S. [590] at 593, 82 S.Ct. [987] at 989 [, 8 L.Ed.2d 130] (quoting *Mugler v. Kansas,* 123 U.S. 623, 668–69, 8 S.Ct. 273, 300–01, 31 L.Ed. 205 (1887). The support requirements thus cannot be said to interfere with reasonable investment-backed expectations.

*Id.* at 716–17 (emphasis in original).

The circumstances in the instant case are analogous. Plaintiffs could not reasonably have expected to use their breeding stock when it was in the public interest to establish a quarantine. Put another way, plaintiffs should have anticipated that, in the event of an outbreak of avian influenza, the federal and state governments might impose limitations on the use of their property.

Further, the character of the governmental action negates a taking here. There was no physical invasion of the plaintiffs' property. Rather, plaintiffs were limited in the way that they could use their hatchery and sell their eggs and birds. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, [citation omitted], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central, supra,* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648 (brackets added). *See also Keystone Bituminous, supra.*

We conclude that there was no taking under the fifth amendment here.

### B. *The Defendants' Actions Did Not Violate Plaintiffs' Right to Due Process of Law.*

The fifth amendment and the fourteenth amendment both guarantee due process of law. Plaintiffs have made a substantive due process claim and agree with defendants that the relevant test is the traditional one to be applied to economic

regulations. Such regulations are upheld "absent proof of arbitrariness or irrationality." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595, 617 (1978). *See also National Railroad Passenger Corp. v. Atchison, Topeka and Santa Fe Railway Co.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).

Plaintiffs attempt to show the irrationality of the regulations by way of an affidavit of their expert, Dr. John A. Newman. Dr. Newman concludes that the quarantine was arbitrarily imposed and comments as follows. First, chicken hatching eggs and chicks hatched from eggs produced by breeders within the quarantine zone could have been shipped anywhere outside the zone as long as they were produced by breeders and hatcheries subject to the surveillance procedure set forth at 49 Fed. Reg. 8412, 8413. Such procedures were deemed sufficient for the unrestricted movement of table eggs and should be considered sufficient for the movement of breeding eggs and chicks. Further, a holding period of two weeks would have insured that a breeder flock was not transmitting lethal avian influenza to the eggs since the incubation period for the disease is about five to seven days. Additionally, breeders infected with the lethal virus would exhibit a marked drop in egg production in five to seven days. Thus, holding the hatched eggs for two weeks before permitting incubation would allow for detection of the disease before any chicks could leave the quarantine zone. Moreover, the twenty-one day period before a chick is hatched from an egg provides additional time to determine if the flock is infected. The plaintiffs' expert also points out that the chicks would be coming from breeders deemed free from lethal influenza and therefore could not pose the risk of spreading the disease. In fact, the doctor asserts that the chicks hatched from eggs produced from breeders in the hatchery would more likely be free from the disease than eggs brought in from outside the quarantine area, as permitted by defend-

ants, since the hatchery would be subject to closer surveillance.

The expert next points to what he perceives to be arbitrary enforcement of the regulations. First, plaintiffs' hatchery was placed under quarantine when the nearest outbreak of lethal influenza was twelve to fifteen miles away yet in another instance another farm was permitted to ship poultry although it was only a mile away from a farm contaminated with the lethal virus. Federal regulations supposedly provided that farms within a five mile radius of a farm with an outbreak of lethal virus should be subject to restrictions.

Second, regulations provided that quarantine zones should have clearly definable boundaries. Defendants should not have used the southern York County line as a boundary line. Rather, they should have used Pa. Route 116 and then gone west to the York County line. Plaintiffs would not have been included within this zone.

Finally, plaintiffs complain that it was arbitrary and capricious to keep plaintiffs under quarantine for a period of seven months from the last outbreak of infection on another farm on December 27, 1983. They point to quarantines in Virginia and Maryland in which the lifting of the quarantine occurred in a much shorter time.

The state defendants have filed a statement of undisputed facts which counter the allegations of the expert's affidavit. Plaintiffs have not filed a statement in opposition although they had the opportunity to do so under the local rules. Accordingly, we will accept as true the allegations in defendants' statement. They more than satisfy the due process requirement that government action not be arbitrary or irrational. Thus, the state defendants point out the following. First, no test existed by which it could be determined immediately before shipment that birds were infected with the virus. The virus is highly contagious and can be transmitted by humans on shoes, clothing and equipment. The virus may be spread through the air and is shed from an infected bird in feces, aerosols and other body fluids. There are various theo-

ries about how the disease is spread and, most importantly, the experts do not all agree on how to control its spread. (Statement of undisputed facts, ¶ 55). In light of the importance of the poultry industry, the quarantine limitations were imposed.

Second, in establishing a quarantine zone proximity to a source of infection is only one factor to consider. Thus, that the regulations spoke of five mile buffer zones is irrelevant to plaintiffs' situation. They were surrounded by a semi-circle of infected farms and their inclusion in the zone was appropriate.

Third, defendants assert, contrary to the plaintiffs' position, that eggs coming from outside the zone are less likely to be infected simply because they are coming from an area not known to be contaminated with the virus. We cannot say that this conclusion is arbitrary especially when it is considered that the surveillance, depended upon by plaintiffs' expert to insure healthy breeding eggs, requires farmer cooperation.

Fourth, defendants assert that plaintiffs have their facts wrong in connection with the farm permitted to ship poultry although it was only one mile from an infected farm. The infected farm did not have the lethal strain of avian influenza and the regulation cited by plaintiffs deal only with the lethal form of the virus.

Fifth, defendants point out that no conclusions can be drawn from a simple comparison between the experiences in Virginia and Maryland and Pennsylvania. We agree. Without more specifics from plaintiffs the comparison to other states is not valid.

Defendants' brief goes on to detail other arguments in support of their position. Thus, as stated by defendants

> [A]lthough the plaintiffs' expert is correct that the last infected flock in York County was discovered on December 27, 1983, this was not the last evidence of an infection near the plaintiffs. The last flock quarantine[d], approximately 12 miles from the plaintiffs, was discovered at New Oxford [Adams County] on January 27, 1984. Furthermore, although York County in its entirety was released from quarantine on [July] 27, 1984, the plaintiffs were released from the quarantine on June 7, 1984. Consequently, the time period from the last outbreak near the plaintiffs to the lifting of the quarantine for the plaintiffs was only slightly over four months, not seven months as suggested by plaintiffs' expert.

. . . . .

> [T]he plaintiffs' expert suggests that Pennsylvania Route 116 could have been used as a southern boundary to exclude the plaintiffs from the quarantine. Route 116 is not a major road easily recognized by persons other than local residents and would not have provided a clear and defineable boundary to the poultry industry at large. (Van Buskirk at ¶ 70). Route 116 does not completely cross York County and use of it as a southern boundary may have resulted in exclusion of infected flocks at Felton and Windsor from the quarantine. (Van Buskirk at ¶ 71). Use of the Pennsylvania-Maryland line provided a clearer and more defineable boundary. (Van Buskirk at ¶ 72). Furthermore, if individual farms are permitted to carve out their own exceptions to the quarantine, there is created a patchwork quarantine area that would be difficult to identify, and difficult for the Task Force to administer. (Van Buskirk at ¶ 73). Contrary to the assertions of plaintiffs' expert, the use of the Pennsylvania-Maryland line was rationally based.

> [T]he plaintiffs' expert compares hatching eggs and chicks, which were not permitted out of the quarantine zone, with table eggs, which were permitted out of the quarantine zone, to demonstrate that the quarantine was arbitrary and capricious. The comparison by the plaintiffs' expert is inappropriate since table eggs for human consumption are far less likely to come in contact with poultry. The hatching eggs and chicks are usually shipped to other poultry operations where they could come in contact with

live birds and where they would be handled by people in the poultry industry. (Van Buskirk at ¶ 80). The plaintiffs' expert's assertion that hatching eggs cannot transmit avian influenza has not been conclusively proven. It is theoretically possible that eggs can spread the virus. (Van Buskirk at ¶ 81).

(Commonwealth defendants' brief in support of motion for summary judgment at 36–38 (brackets added)).

We conclude that the actions of all the defendants did not violate due process.

### C. *The Federal Defendants Did Not Violate Plaintiffs' Right to Equal Protection.*

An equal protection claim is made against the federal defendants based upon the federal government's decision to reimburse only owners of flocks found to have been infected with the virus. Those flocks were destroyed. Plaintiffs' flocks were never found to have been infected, were not destroyed, and plaintiffs received no compensation even though their business was severely affected. Plaintiffs claim an equal protection violation as a result.

■ The analysis here is similar to that conducted under the due process clause. When government regulates economic matters, its actions will be sustained if it could have reasonably concluded that the challenged classification would promote a legitimate state purpose. *See Harrisburg Hospital v. Thornburgh,* 616 F.Supp. 699 (M.D.Pa.1985). As stated by the federal defendants, these regulations:

> were promulgated to encourage poultry owners to depopulate infected or exposed flocks in order to bring the outbreak of avian influenza under control. The provisions were not meant to apply to owners of non-infected or non-exposed poultry, as there was no reason to encourage these owners to depopulate their flocks since these flocks were not as likely to spread or harbor the disease.

**4.** Because of our disposition above, we will not deal with the defense of qualified immunity or the claim of defendant, James O. Lee Jr., that he

(Federal defendants' brief in support of motion for summary judgment at 16).

We conclude that there was no equal protection violation.[4] We will issue an appropriate order.

had no personal involvement with the action. We do, however, agree with his argument.