AMERICAN MARINE RAIL
NJ, LLC, Plaintiff,

v.

The CITY OF BAYONNE; County of
Hudson; Hudson County Improve-
ment Authority; and Hudson County
Executive Robert Janiszewski, Defen-
dants.

Civil Action No. 99–4968 (WJM).

United States District Court,
D. New Jersey.

Nov. 6, 2003.

Richard A. Crooker, Cuyler Burk, Parsippany, NJ, for plaintiff.

Lisa Barre–Quick, Apruzzese, McDermott, Mastro & Murphy, Liberty Corner, NJ, for The City of Bayonne.

Angelo J. Genova, Laura H. Corvo, Genova, Burns & Vernoia, Livingston, NJ, for Hudson County Improvement Authority.

Thomas R. Kobin, Chasen, Leyner, Bariso & Lamparello, Secaucus, NJ, for County of Hudson, Hudson County Executive Robert Janiszewski.

## OPINION

MARTINI, District Judge.

This matter comes before the Court on defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. In its second amended complaint, plaintiff American Marine Rail NJ, LLC ("AMR NJ") contends that the conduct of the defendants—the City of Bayonne ("Bayonne"), County of Hudson ("Hudson County"), the Hudson County Improvement Authority ("HCIA"), and former Hudson County Executive Robert Janiszewski ("Janiszewski")—violated the Commerce Clause and the Fifth and Fourteenth Amendments to the United States Constitution. In addition, AMR NJ alleges that Bayonne breached its lease agreement with AMR NJ. For the reasons set forth below, defendants' motions are granted in part and denied in part.

The central issues on summary judgment are: (1) whether the defendants' conduct in denying plaintiff's application for inclusion in Hudson County's Solid Waste Management Plan ("SWMP") violates the dormant Commerce Clause; (2) whether plaintiff has established a protected property interest under the substantive component of the Fourteenth Amendment's due process clause, and if so, whether the conduct of the defendants in denying plaintiff's application for inclusion in the SWMP "shocks the conscience"; (3) whether plaintiff has established an unconstitutional taking under the Fifth Amendment to the United States Constitution; (4) whether defendant City of Bayonne breached its lease with plaintiff; and (5) whether plaintiff can proceed at trial on its claims for lost profits.

The Court finds that material issues of fact preclude summary judgment on the Fourteenth Amendment substantive due process claim and the Commerce Clause claim as to all defendants. The Court grants summary judgment in favor of all defendants on the Fifth Amendment Takings claim. Furthermore, the Court denies defendant Bayonne's motion for summary judgment on the breach of contract claims. Finally, the Court precludes plaintiff from pursuing its claims for lost profits under any of its theories of liability.

## FACTUAL BACKGROUND

AMR NJ is a New Jersey limited liability corporation. It was formed to provide transport for residential and office solid waste from New York City to a proposed solid waste transfer facility in Bayonne, New Jersey for shipment by rail to landfill sites in locations outside of New Jersey. Bayonne is a municipal corporation of the State of New Jersey, located in Hudson County. Hudson County, one of twenty-one New Jersey counties, is a solid waste management district. The HCIA is empowered by state statute to formulate and adopt a Solid Waste Management Plan for the district. Janiszewski was the Hudson County Executive at the time of the events in question.

In May of 1996, New York City Mayor Rudolph Giuliani and New York state Governor George Pataki announced that Fresh Kills Landfill, located on Staten Island, would close by January 1, 2002. *See* Final Environmental Impact Stmt. ("FEIS"), Kobin Cert., Exhibit 1, at p. 1–2. In addition, the Mayor noted that New York City would not open new landfills or reopen

landfills or incinerators within its borders. *See id.* To accommodate these policies, the City needed to develop a new waste management infrastructure. *See id.* The Fresh Kills Closure Task Force, which was established to achieve the closure deadline, recommended, among other things, the long-term export of waste by barge or rail. *See id.*

On June 16, 1997, New York City's Department of Sanitation ("NYCDOS") issued a "Request for Proposals to Receive Solid Waste at a Marine Transfer Station Operated by the New York City Department of Sanitation and Dispose of the Solid Waste Received at an Out–of–City Facility" ("RFP"). In connection with the RFP, NYCDOS expected "to execute one or more full service contracts of at least twenty years duration with one or more qualified vendors." RFP, Kobin Cert., Exhibit 3, at p. 1. The RFP noted that any contract entered into with NYCDOS would be structured so that if the funds necessary to continue the contract were not available during any fiscal period, the contract would be automatically canceled. *See id.* In addition, the RFP stated that contracts would not be awarded solely based on the annual fee proposed, but on the "most advantageous combination of quality and cost." *See id.* at p. 12. NYCDOS reserved the right, in its sole discretion, to withdraw the RFP or to postpone or cancel the procurement effort at any time. *See id.*

By October 17, 1997, in response to the RFP, NYCDOS received thirteen proposals. *See* FEIS, at p. 1–19. One of the proposals was submitted by American Marine Rail New York, LLC, ("AMR NY")

for an enclosed barge unloading facility ("EBUF") located in the Bronx, New York.[1] NYCDOS convened a committee to evaluate the proposals. *See* NYCDOS Comprehensive Solid Waste Management Plan, February 2001, Kobin Cert., Exhibit 6, at p. 19. In January of 1999, the committee decided to request best and final offers from two companies, Browning Ferris Industries and Waste Management, which were considered "recommended proposers." *See id.* at p. 24. In addition, the committee requested best and final offers from American Marine Rail and Port Ivory Alliance, which were considered "the highest ranked nonrecommended proposers." *See id.* In response to this request, on March 31, 1999, American Marine Rail, LLC submitted an amended proposal, which included plans for two separate EBUFs—the in-state facility in the Bronx, and a new, additional facility in Bayonne, New Jersey. *See* American Marine Rail March 31, 1999 Submission, Kobin Cert., Exhibit 8, at p. 7.

In connection with its proposed Bayonne EBUF, on April 1, 1999, AMR NJ and defendant Bayonne entered into a fifty-year lease for a piece of public property located on Ingham Avenue in Bayonne, New Jersey.[2] The site, the former Standard Tank locale, was highly contaminated at the time that AMR NJ leased it. The lease permitted AMR NJ to use "the Premises for the purpose of developing and operating a transfer terminal and/or recycling center for waste materials and other bulk materials and cargo ..., and for no other purpose without the express written consent of the landlord which shall not be unreasonably withheld or delayed."

---

**1.** American Marine Rail New York and the plaintiff in this case, AMR NJ, are separate entities having common members.

**2.** In October 1998, Bayonne put out a public notice for bids on the Ingham Avenue proper-

ty. AMR NJ's initial bid was rejected as non-compliant. *See* Resolution No. 98–11–25–78, Kobin Cert., Exhibit 17. Bayonne announced a second request for bids and the City Council accepted AMR NJ's proposal. *See* Resolution No. 98–12–16–68, Kobin Cert., Exhibit 18.

Lease, Kobin Cert., Exhibit 19, at p. 11 § 6(a). Among other things, the lease contained the following cooperation clause:

Tenant, at its expense, shall be solely responsible for obtaining all licenses, permits, certificates or other authorizations which may be required from governmental authorities to provide for the lawful use and occupancy of the Premises. Landlord represents that it will cooperate with the Tenant in connection with Tenant's efforts to obtain all such licenses, permits, certificates or other authorizations.

*Id.* at p. 12 § 7(b). Bayonne also agreed to "cooperate with the Tenant in working with the New Jersey Department of Environmental Protection with respect to the issue of site remediation." *Id.* at p. 13 § 7(d).

In order to remediate the leased Bayonne site for the operation of the proposed EBUF, AMR NJ needed to acquire numerous operational and federal permits. *See* Defendants' Stmt. of Facts, at ¶ 91. Furthermore, AMR NJ needed to complete an environmental site investigation, develop a remediation plan for approval by New Jersey's Department of Environmental Protection ("NJDEP"), and then remediate the site. *See id.* at ¶ 92. Before NJDEP would issue a solid waste facility permit for the site, AMR NJ was required to attain inclusion in Hudson County's Solid Waste Management Plan. *See id.* at ¶ 93. In furtherance of this goal, on February 1, 1999, AMR NJ filed an "Application for Inclusion of a Solid Waste Facility or Recycling Center in the Hudson County Solid Waste Management Plan" with the HCIA. *See* Application, Kobin Cert., Exhibit 32. The application was formatted as a standardized set of inquiries to which AMR NJ also attached an appendix, providing detailed information about the operation of the proposed EBUF, including sections on odor, air pollution, noise, and litter control. *See id.* at

pp. 10–13. By a letter dated April 30, 1999, the HCIA requested additional information from AMR NJ about the proposed facility, and AMR NJ complied with the request. *See* April 30, 1999 Letter, Kobin Cert., Exhibit 40; July 27, 1999 AMR NJ Response, Kobin Cert., Exhibit 41.

As part of its review of AMR NJ's project, the HCIA contracted with an engineering firm, Paulus Sokolowski and Sartor, and a law firm, DeCotis, Fitzpatrick & Gluck. On October 8, 1999, the HCIA sent notice of a public hearing to be held on October 13, 1999 regarding inclusion of the AMR NJ project in the Hudson County SWMP. Ronald Klempner, one of AMR NJ's principals, and AMR NJ's attorneys attended the public hearing. At the hearing, the legal and engineering findings were presented by the respective firm representatives. Both firms, for various reasons, recommended that the HCIA deny AMR NJ's application. *See* Transcript of October 13, 1999 HCIA Meeting, DiLascio Cert, Exhibit DD, at pp. 15, 17. Neither Mr. Klempner nor any AMR NJ representative spoke at the hearing.

Throughout the summer of 1999 and prior to the October 13, 1999 HCIA public hearing, opposition to AMR NJ's proposed project developed within the community. The Bayonne Planning Board approved the project at its July 13, 1999 meeting. At that meeting, however, city residents who lived adjacent or near the proposed site expressed concern about the project, and specifically questioned the potential impact on property values, and the noise and pollution that the trains would produce in the neighborhood. *See* Transcript of Planning Board Meeting, DiLascio Cert., Exhibit II. In addition, at the Planning Board meeting, anti-New York garbage sentiment was expressed by local residents. For example, one Bayonne resident asked the following rhetorical ques-

tion: "So why are we allowing an outside company with no track record, no history in the City [of Bayonne] to bring garbage into Bayonne and then take it out on the rails?" *Id.* at p. 155. The resident's own answer was "[l]et New York City take care of its own garbage." *Id.* Besides attending the planning board meeting and vocalizing their opposition, local residents organized a group called Residents Against Transfer Station (RATS), planned public demonstrations, and circulated petitions against the facility. Robert Janiszewski issued a letter to all "Bayonne Residents" advising them that "the proposed project would not be beneficial to the community of Bayonne or the County of Hudson." Janiszewski Letter, DiLascio Cert., Exhibit Q. This letter acknowledged that Janiszewski previously believed that the project had merit, but upon closer reexamination realized that it raised "serious concerns."

At the HCIA public hearing, Janiszewski, as well as individuals who resided in the vicinity of the proposed facility, spoke out against inclusion of the project in the SWMP. Among other things, Janiszweski stated that "New York City's challenge should not become New Jersey's problem or Bayonne's burden." October 13, 1999 Transcript, DiLascio Cert., Exhibit DD, at p. 25. Bayonne residents expressed similar sentiments, such as "New York City should take care of their [sic] own garbage." *Id.* at p. 50. At the close of the hearing, Chairman John Shinnick moved to introduce a resolution recommending to the Hudson County Board of Chosen Freeholders that inclusion of AMR NJ's application in the Hudson County SWMP be denied. *See id.* at p. 60. That evening, the motion was unanimously approved. On October 28, 1999, the Board of Chosen Freeholders unanimously accepted the HCIA recommendation.

Approximately two months prior to the HCIA public hearing, on August 18, 1999, the Bayonne City Council adopted a resolution authorizing the Mayor and the City to negotiate with AMR NJ for termination of the Lease. *See* Resolution 99–08–18–001, DiLascio Cert., Exhibit CC. This resolution was announced and read by Bayonne Mayor Joseph Doria at the City Council meeting. According to plaintiff, it learned of Bayonne's decision earlier that day. By a letter dated November 3, 1999, AMR NJ stated that Bayonne's conduct "made it impossible for AMR NJ to perform" on its leasehold obligations, that AMR NJ "is no longer pursuing the Bayonne project," and that "the leasehold is abandoned." *See* DiLascio Cert., Exhibit GG.

New York City's 2001 final waste management plan for replacing the Fresh Kills landfill included negotiating a twenty-year contract with Browning Ferris Industries for the development of an EBUF in Linden, New Jersey. The subsequent administration of Mayor Bloomberg abandoned this plan in its entirety. New York City eventually decided not to rely on out-of-state processing and containerization in any respect. On July 31, 2002, Mayor Bloomberg announced that his administration was discontinuing the prior administration's plan to use a marine-to-rail transfer station in Linden, New Jersey. New York City had decided to utilize and upgrade its existing waste transfer stations, reasoning that this approach was more cost effective and environmentally sound than sending its waste out of state. *See* Corvo Cert., Exhibit 1.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, a Court must construe the facts and inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. No issue for trial exists unless the nonmoving party can adduce sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

## B. Commerce Clause Violation

 Plaintiff's Commerce Clause claims in counts one and two of the second amended complaint are based on the following allegations: (1) that the standards defendants implemented to evaluate plaintiff's project were applied in a manner which had the effect of discriminating against interstate commerce; and (2) that the requirements for SWMP inclusion that defendants applied to AMR NJ were motivated by the intent to discriminate against interstate commerce. In other words, AMR NJ argues that the HCIA decision discriminated against interstate commerce in both its purpose and effect. Notably, AMR NJ does not challenge the constitutionality of the state statute (the Solid Waste Management Act), any regulations or any local ordinances.[3] Indeed, the Act does not differentiate between in-state and out-of-state generated waste, and thus, on its face, the Act does not discriminate against interstate commerce. The United States Constitution provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const., art. I, § 8, cl. 3. Although the Commerce Clause is an affirmative grant to Congress, the courts have interpreted the Commerce Clause to contain a "negative" aspect. This doctrine, referred to as the "dormant" Commerce Clause, limits a state's power to regulate interstate commerce in the absence of authority from the Congress. In essence, the dormant Commerce Clause "prohibits economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). The dormant Commerce Clause thus forbids state or local regulations that "impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." *C & A Carbone Inc. v. Town of Clarkstown*, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). As Justice Jackson articulated in *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 535, 69 S.Ct. 657, 93 L.Ed. 865 (1949):

**3.** New Jersey's Solid Waste Management Act requires, in relevant part, each solid waste management district, which includes Hudson County, "to develop and implement a comprehensive solid waste management plan which meets the needs of every municipality within each such county...." *N.J.S.A.* 13:1E–2(b).

[t]his principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units ... [W]hat is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation.

"Solid waste, even if it has no value, is an article of Commerce" to which Commerce Clause concerns apply. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992).

The Supreme Court has established a two-step inquiry to determine whether a challenged measure violates the dormant Commerce Clause. The first step is to determine whether the measure discriminates against out-of-state articles of commerce. There are three theories available to determine whether discrimination has occurred. First, a measure may be facially discriminatory against out-of-state interests. *See Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (striking down statute that prohibited the importation of waste which originated outside of the state). Second, a challenged measure may have been enacted with a discriminatory purpose. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (finding Hawaii liquor tax exemption had a discriminatory purpose because it was passed to aid local liquor industry). Third, a facially neutral measure may have a discriminatory effect. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 351–52, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (finding that North Carolina statute which prohibited the display of Washington state apple grades had a discriminatory effect on Washington apple growers in the North Carolina market).

In the second step of the inquiry, if a measure is found to discriminate against interstate commerce, it must be examined under heightened scrutiny. Indeed, a discriminatory measure is *per se* invalid unless the state "can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone*, 511 U.S. at 392, 114 S.Ct. 1677. If a measure is not discriminatory, it will be found unconstitutional if the burden it imposes on interstate commerce "is clearly excessive in relation to its putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Third Circuit has observed that "the distinction between state [measures] subject only to *Pike* balancing and those that are nearly *per se* invalid is 'hazy.' " *Cloverland–Green Spring Dairies, Inc. v. Penn. Milk Mktg. Bd.*, 298 F.3d 201, 211 (3d Cir.2002).

In the present case, plaintiff argues that it has proffered sufficient evidence to withstand summary judgment of a discriminatory effect and/or purpose in the HCIA's decision against the project's SWMP inclusion. As evidence that the decision was made for a discriminatory purpose-namely because the waste that would be processed through the transfer station originated in New York City—plaintiff points to, among other things, the apparent requirement imposed by the HCIA that a SWMP applicant demonstrate that its project benefit the solid waste disposal needs of Hudson County. This requirement appears in the HCIA's expert report generated by its legal counsel. Specifically, this report noted, as one of its concerns raised by AMR NJ's application, that "the proposed facility provides no benefit to the County, in that the AMR

NJ facility is not intended or designed to receive, nor will it be capable of receiving, any Hudson County-generated waste." *See* Kobin Cert., Exhibit 54, at pp. 1–2. HCIA argues that a host site is allowed to consider this concern under the Solid Waste Management Act. The relevant portion of the Act, cited by defendants, provides that each County is responsible for developing and implementing "a solid waste management plan which meets the needs of every municipality within each such county." N.J.S.A. 13:1E–2(b)(2).

The cited provision of the Act is contained within the statute's legislative findings as one of the enumerated policies of the state of New Jersey in enacting a solid waste management plan. The Court is not persuaded that this policy provision allows a County to reject a project from SWMP inclusion because the transfer station would not receive Hudson county generated waste. A reasonable interpretation of defendants' stated concern is that a precondition for SWMP inclusion is that a facility must receive Hudson County waste. In other words, because the AMR NJ project would only process New York City generated waste, the project does not benefit Hudson County and thus is not amenable to SWMP inclusion. A reasonable fact finder could view this concern as a protectionist measure in that the origin of the waste is an underlying reason for rejecting AMR NJ's application. Moreover, while defendants interpret the Act to allow them to reject a proposal because it does not process Hudson county waste, a fact finder could view this interpretation as overreaching or invalid under the policies of the statute.

In addition to the expert reports which arguably present a protectionist reason for rejecting AMR NJ's application, there is also evidence that the HCIA heard testimony which evinced protectionist sentiment from private citizens at its October 13, 1999 public hearing. In addition, some of Janiszewski's comments were arguably protectionist. In his role as the County Executive, he appointed the members of the HCIA, and stated in a open letter to the citizens of Bayonne that he would "use the authority of [his] office to urge the Commissioners of the HCIA to reject AMR NJ's application." DiLascio Cert., Exhibit Q. Taken together, the public outcry, the expert reports, and Janiszewski's public comments provide sufficient evidence from which a reasonable fact finder could conclude that AMR NJ's application was rejected because the transfer station would process New York City generated waste exclusively. Defendants correctly emphasize that the expert reports and the public response to the AMR NJ project also articulate other concerns, such as the environmental, health and safety effects of the proposed project on County residents. While there is no evidence that HCIA members themselves publicly uttered protectionist sentiments, there is evidence these concerns were presented and considered by the HCIA,[4] and thus it is the role of the fact finder to determine whether AMR NJ's application was denied for impermissible reasons under the Commerce Clause.

If a fact finder determines that the decision was made for a discriminatory purpose, there are also material issues of fact, under the *Pike* balancing test, as to whether defendants had no other means, except

---

4. The HCIA resolution denying plaintiff's application is broadly and vaguely worded, stating that "it is not in the best interests of the County of Hudson and the citizens of Hudson County to include the proposed marine transfer station in the Hudson County District Solid Waste Management Plan." Kobin Cert., Exhibit 56. The resolution acknowledges that the HCIA considered the expert reports before it in making its determination.

rejecting AMR NJ's application, to advance their local interests. While defendants argue that legitimate environmental concerns, among other things, motivated the denial, plaintiff avers that the HCIA could have conditionally approved the application, or could have renounced the protectionist rhetoric in the resolution that denied the application. It is the role of the fact finder to determine whether there were alternate means for defendants to achieve their local interests.

## C. Fourteenth Amendment Due Process Claim

### C.1. Protected Property Interest

Count three of the second amended complaint alleges that Bayonne's opposition to AMR NJ's project and the denial by HCIA for inclusion of the project in the County's SWMP infringed upon AMR NJ's constitutionally protected substantive due process rights under the Fourteenth Amendment to the United States Constitution. Plaintiff claims that it was deprived of a constitutionally protected property interest as a result of the defendants' conduct. This claim is brought pursuant to 42 U.S.C. § 1983.

▮▮▮▮ The Fourteenth Amendment maintains that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Substantive due process is an area of the law famous for its controversy, and not known for its simplicity." *DeBlasio v. Zoning Bd. of Adjustment for the Township of W. Amwell*, 53 F.3d 592, 598 (3d Cir.1995). To state a substantive due cess claim under § 1983 for a property deprivation, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir.2000)(*abrogated on other grounds by*

*United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir.2003)). Although state-created property interests are entitled to protection under procedural due process, the Third Circuit Court of Appeals has opined that "[i]t is apparent ... that, in this circuit at least, not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." *See Nicholas v. Pa. State Univ.*, 227 F.3d 133, 141 (3d Cir.2000) (internal quotations and citations omitted). Rather, to state a substantive due process claim, "a plaintiff must have been deprived of a particular quality of property interest." *DeBlasio*, 53 F.3d at 598.

▮▮▮ The Supreme Court has provided little guidance as to the "particular quality" of property interests that a Court should afford substantive due process protection. The Third Circuit has announced at least one "guiding principle" in this area: "whether a certain property interest embodies [a] 'particular quality' is not determined by reference to state law, but rather depends on whether that interest is 'fundamental' under the United States Constitution." *Nicholas*, 227 F.3d at 140. Accordingly, the Third Circuit has concluded that "ownership is a property interest worthy of substantive due process protection." *DeBlasio*, 53 F.3d at 600. More particularly,

in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached.

*Id.* at 601. By implication, a lessor, like a property owner, "possesses a property in-

terest worthy of substantive due process protection against arbitrary and irrational governmental deprivation." *Id.* at 600 n. 10 ("Having implied in *Neiderhiser [v. Borough of Berwick,* 840 F.2d 213 (3d Cir. 1988)] that a lessor possesses a property interest worthy of substantive due process protection against arbitrary and irrational governmental deprivation, an actual property owner, *a fortiori,* possesses such an interest.").

■ In the present case, plaintiff characterizes its property interest in its brief as its "leasehold right pursuant to its 50–year lease with the City of Bayonne." Plaintiff's Brief, at p. 44. This "right" includes "the right to use the property to the full extent permitted under the Lease." *Id.* A permitted use under the Lease was the marine-to-rail transfer station. In support of its argument that it has stated a protected property interest in its leasehold, AMR NJ relies upon the Third Circuit's conclusions in *DeBlasio* that ownership, and thus impliedly leaseholds, are fundamental property interests worthy of substantive due process protection. Simply stated, under plaintiff's theory, its property interest is its right under the Lease with Bayonne to develop the leased property as a marine-to-rail transfer station.

In opposition, all defendants argue that plaintiff's substantive due process claim must fail as a matter of law because plaintiff does not possess a constitutionally protected property interest. In support of this argument, defendants describe plaintiff's property interest as the lost business opportunities and income stream that the marine-to-rail transfer station would have generated. Defendants point out that at the time of the alleged constitutional violation, plaintiff's project was in its nascent

stages, as multiple permits and a contract with NYDOS had not yet been realized. As such, the contingent and nebulous nature of the project does not establish a cognizable property interest protected by the Fourteenth Amendment. In response, plaintiff urges this Court to examine the "character of the property right, and not the number of permits required to make profitable use of that right" when making the determination of the existence of a protected property interest. *See* Plaintiff's Brief, at p. 63.

In *DeBlasio,* the Third Circuit has taken an expansive view of the scope of protected property interests under the substantive component of the due process clause. The *DeBlasio* standard suggests that the existence of a property interest depends upon the functional value of the subject property. That is, the "use and enjoyment" of a subject property are rights that are inherent to ownership, and, by implication, to a leasehold.[5] In the present case, plaintiff's leasehold entitled it to develop the property at issue into a marine-to-rail transfer station. It is undisputed that this use of the property was contemplated by all parties at the time that the HCIA made its decision denying the project's inclusion in the County's SWMP. Moreover, SWMP inclusion was necessary in order for plaintiff to submit an application to New Jersey's Department of Environmental Protection, which regulates, through registration and permitting, waste collection facilities. In this regard, the HCIA's decision impinged upon plaintiff's ability to continue the permitting process, and thus a planned use for the site was interrupted. Under the broad standard articulated in *DeBlasio,* plaintiff's planned use of the leasehold

---

5. The Seventh Circuit has described the "right of use" that is at issue in land use regulation cases as "one of the bundle of rights attendant to ownership under the laws of property in all states." *Polenz v. Parrott,* 883 F.2d 551, 556 (7th Cir.1989).

qualifies as property interest under substantive due process.

Defendants' primary argument focuses on the contingent nature of the planned use for the site. This argument is based on plaintiff's "failure to establish a property interest in the speculative and nebulous value of its proposed solid waste transfer station[.]" HCIA Reply Brief, at p. 13. This Court does not read *DeBlasio*, however, as requiring that a plaintiff must establish the particular value of its property interest to demonstrate a protected interest in the property's use and enjoyment. *See, e.g., DeBlasio*, 53 F.3d at 600 n. 9 (agreeing with the Second Circuit Court of Appeals that a Fourteenth Amendment property interest "includes not only what is owned but also, in some limited circumstances, what is sought.") (citation and quotations omitted). This is not to say that the monetary value of the unrealized project is not material to this matter. Whether the proposed project would have been achieved in order to generate profits is highly relevant to a determination of the damages, if any, that plaintiff sustained as a result, if proven, of any allegedly unconstitutional conduct.[6]

Defendants attempt to distinguish *DeBlasio*, arguing that "unlike the zoning boards in the *DeBlasio* cases whose discretion in denying or granting the permits at issue were vastly limited by statute [sic] or ordinance, New Jersey's Solid Waste Management Act gives the County broad discretion in implementing and amending its SWMP." HCIA Reply, at p. 9. Relying on *Woodwind Estates*, defendants contend that because the County had broad discretion in deciding against AMR NJ's SWMP application, plaintiff had no entitlement to the HCIA's approval of its application for SWMP inclusion. In *Woodwind Estates*,

the plaintiff argued that it had "a protected property right in the approval of its development plans [for an affordable housing project]." *Woodwind*, 205 F.3d at 123. The Court found that because Woodwind satisfied all of the requirements for approval of its plans and because the defendant Township had limited discretion regarding the approval, Woodwind stated a protected property interest in their development plan. *Id.* According to defendants, *Woodwind* establishes that the Third Circuit has departed from *DeBlasio*, in that in land use approval cases, such as the present matter, the property interest at stake is the sought-after approval itself, and not ownership or a leasehold. *See* Bayonne Reply, at p. 23. Under the *Woodwind* approach, absent a clear entitlement to an approval or permit, there is no constitutionally protected property interest.

Contrary to defendants' assertion, *Woodwind Estates* has not overruled *DeBlasio*. The *Woodwind* Court analyzed whether a plaintiff established a protected property interest in approval plans without touching upon whether the right to the use and enjoyment of property provides a basis for a plaintiff to establish a protected interest. *Woodwind Estates* offers an alternative theory for establishing a property interest for a substantive due process claim—namely, a landowner can claim a property interest in a permit or approval if an ordinance, regulation or law sets forth specific criteria that, if met, dictate that the permit or approval issue. Stated differently, *Woodwind Estates* and *DeBlasio* present two theories which could support a plaintiff's claim of a protected property interest, neither of which defeats or excludes the other. In this regard, *Woodwind Estates* does not control the Court's

---

6. See Section G., *infra,* for the Court's analysis of causation and damages on plaintiff's

lost profits claim.

determination of whether plaintiff has articulated a protected property interest in this case.

For the foregoing reasons, this Court is not persuaded by defendants' arguments and finds that under *DeBlasio*, plaintiff has established a protected property interest in the use and development of its leasehold interest.

### C.2. Conduct that Shocks the Conscience

The second part of a substantive due process claim requires a plaintiff to show that the alleged conduct was so arbitrary or egregious as to shock the conscience. *See United Artists Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400–01 (3d. Cir.2003). The shocks the conscience standard "is no calibrated yardstick," and thus conduct that "shocks in one environment may not be so patently egregious in another." *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 850, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). While there is no precise formula to determine the contours of the standard, the Third Circuit has opined that "shocks the conscience" is more demanding than the "improper motive" test that had applied to governmental behavior in land-use regulation cases. *See United Artists*, 316 F.3d at 400.

In the wake of *United Artists*, the following two reported district court decisions have applied the shocks the conscience standard in the land use regulation context. In *Levin v. Upper Makefield Township*, 99 CV 5313, 2003 WL 21652301, at *9 (E.D.Pa. Feb. 25, 2003), the court found that the Township's purposeful delays, its "bad motive" in delaying plaintiff's zoning permit, and the "secret-society badinage" between zoning board Supervisors did not rise to the level of "conscience shocking" conduct. In *Grimm v. Sweeney*, 249 F.Supp.2d 571 (E.D.Pa.2003), the

Court analyzed whether the issuance of numerous citations and building code violations by borough officials violated, among other things, plaintiffs' substantive due process rights. Plaintiffs alleged that certain governmental officials harbored animus toward plaintiff because plaintiffs had participated in numerous law suits against the borough. Because the issuance of each citation was supported by ample evidence and reasonable interpretations of the building code regulations, the Court concluded that the defendants' behavior was not arbitrary, irrational or conscience shocking. *See id.* at 608–16. The holdings of these two cases demonstrate that improper motives, particularly personal animus toward a plaintiff, do not shock the conscience for constitutional purposes. These conclusions thus reflect the Third Circuit's admonition that conscience shocking conduct demands more than an improper motive or a government decision that is unrelated to the merits.

In the present case, the "improper motive" that plaintiff alleges is that protectionist sentiment drove the decision to deny plaintiff's SWMP application. This improper motive is distinguishable from conduct that is driven by personal animus or bad feelings between a plaintiff and governmental entity. The improper motive in the present case, if proven, could constitute a constitutional violation under the Commerce Clause. As articulated earlier, there are questions of material fact regarding the alleged Commerce Clause violations. In determining that the defendants denied the SWMP application for impermissible reasons, a fact finder could also determine that violation of another constitutional provision, i.e. the Commerce Clause, satisfies the conscience shocking standard for a substantive due process violation. The Court will thus deny defendants' motion for summary judgment as

material issues of fact preclude a determination of whether the defendants' conduct shocks the conscience.[7]

### D. Unconstitutional Taking

Plaintiff's second amended complaint does not include a separate count for an unconstitutional taking of plaintiff's property. The fourth count references the Fifth Amendment, and the parties have briefed the issue of whether plaintiff has established a claim for an unconstitutional taking. Accordingly, the Court will address the merits of this cause of action to determine whether a genuine issue of material fact exists.

■■■■■ A claim for a taking without just compensation is pursued under the Fifth Amendment, which is made applicable through the Fourteenth Amendment. The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment does not prohibit the taking of private property by the state, "but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). It is designed "not to limit the governmental interference with property right per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *Id.* at 315, 107 S.Ct. 2378.

■■■■ The Third Circuit set forth the factors to be considered in determining whether state action constitutes a taking without just compensation in *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 715 (3d Cir.1985), *aff'd*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The *Keystone* Court stated that a "taking may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 771 F.2d at 712 (*quoting Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978)). An actual physical invasion of property is one type of taking. In other situations, a taking may occur if a state or local government "reasonably conclude[s] that the 'health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land." *Midnight Sessions Ltd. v. City of Philadelphia*, 945 F.2d 667, 676 (3d Cir.1991).

7. Executive and legislative powers are vested in county boards of freeholders. *See* N.J.S.A. 40:20–1. On this basis, Hudson County argues that the HCIA's resolution and the County's adoption of that resolution are quasi-legislative actions that can only be struck down if they fail rational basis review. Under a substantive due process analysis, there is, as defendants suggest, a critical distinction between legislative and executive actions. The Third Circuit has noted that " '[e]xecutive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society.' " *Nicholas*, 227 F.3d at 139 (*quoting Homar v. Gilbert*, 89 F.3d 1009, 1027 (3d Cir.1996) (Alito, J., concurring in part and dissenting in part)).

In the instant action, the Court will not grant summary judgment in favor of Hudson County on the basis that the resolutions cannot withstand rational basis review. Under either the shocks the conscience or rational basis standards, a fact finder could conclude that if the HCIA and Hudson County violated the Commerce Clause, a constitutional violation, then that violation could constitute conduct that is either conscience shocking or is not rationally related to a legitimate governmental interest.

 The case at bar is akin to a regulatory taking matter insofar as the HCIA decision prohibited plaintiff's contemplated use of the land as a marine-to-rail transfer station. In this context, a taking is not established simply upon a showing of "the denial of 'the ability to exploit a property interest that [the plaintiffs] heretofore had believed was available.'" *Midnight Sessions*, 945 F.2d at 676 (citations omitted). Rather, the governmental action must result in an extensive denial of the value of the property interest. An additional factor that courts consider is the diminution in present value of the property that the alleged interference caused. *See Keystone*, 771 F.2d at 713. Under these factors, the task of proving an unconstitutional taking is a difficult one.

 In the case at bar, the court's consideration of the two aforementioned factors militate against plaintiff's claim that it was subjected to an unconstitutional taking. First, there is no evidence in the record that the HCIA's decision diminished the present value of the leasehold interest at the time the decision was rendered. Plaintiff had not been awarded a contract with the NYCDOS at the time of the adverse decision, and thus the monetary value of plaintiff's leasehold interest remained constant before and after the HCIA decision.

Additionally, plaintiff has not demonstrated that the HCIA denial deprived it of all economically viable uses of the property under the terms of the leasehold. While plaintiff's intended use of the property was to construct a marine-to-rail transfer station, and plaintiff argues that this use was the only use, the actual lease suggests otherwise. A permitted use, according to the lease, was for a marine-to-rail transfer station. *See* Lease, Kobin Cert., Exhibit 19, at p. 4. The lease also provided that the property could not be used for other purposes "without the express written consent of the Landlord which shall not be unreasonably withheld or delayed." *Id.* at p. 11. Under these terms, the lease does not expressly prohibit other uses of the property but merely conditions a use other than the transfer station on the approval of the landlord. Under these circumstances, the Court is satisfied that an unconstitutional taking did not occur.

### E. Liability as to Each Defendant for Constitutional Violations

In addition to challenging the merits of plaintiff's constitutional claims, each defendant presents separate arguments regarding its liability under Section 1983 for the alleged constitutional violations. The Court will briefly address these arguments.

The HCIA contends that it did not issue an official proclamation, policy or edict which would hold it liable under Section 1983. In addition, the HCIA asserts that even if it issued an official policy or edict, the HCIA was not the final decision maker insofar as it only issued a recommendation to the Board of Freeholders, which made the final decision to deny plaintiff's application. Because it is not the final decision maker, the HCIA theoretically did not cause an alleged constitutional violation. Although not articulated as such, the crux of this argument is that the HCIA did not directly cause a constitutional violation.

 HCIA cites *Monell v. New York City Dep't of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) in support of its arguments. *Monell* established that a government entity may be held liable for a constitutional violation if that violation results from the issuance of an official policy or custom. In particular, *Monell* noted that a municipality could not be held liable under Section 1983 for the acts of its employees on a theory of respondeat superior. "The 'official policy'

requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). For the purpose of distinguishing between the acts of the employees and the acts of the municipality, a "policy" is made when a decision maker who possesses final authority issues an official proclamation or edict.

In case at bar, AMR NJ seeks to hold the HCIA, as a policy making body, liable under Section 1983. As it is the entity responsible for formulating the SWMP for the County, HCIA *is* unquestionably a policy maker. To the extent that HCIA argues that it did not directly *cause* a constitutional deprivation because it is not a final decision maker, defendant's reliance on *Monell* is misplaced. In *Monell*, the issue of causation is linked to whether an entity can be held liable for the alleged unconstitutional conduct of its employees. In the present matter, whether the HCIA was directly responsible for the alleged constitutional deprivation or whether the HCIA caused AMR NJ to be subjected to a constitutional violation are questions separate and apart from a municipality's defense against liability under *Monell*. Thus, the HCIA's argument that pursuant to *Monell*, it is not a final decision maker does not relieve it of liability under Section 1983.

Defendant City of Bayonne likewise argues that it cannot be held liable under Section 1983 because it did not "cause" any constitutional violations. More specifically, Bayonne asserts that unlike the HCIA and the County of Hudson, the City was not a decision maker in any respect and therefore its link to the allegedly unconstitutional conduct is too indirect and attenuated for Section 1983 liability. The crux of

this argument is that Bayonne did not vote on AMR NJ's SWMP application, and thus it could not have caused a constitutional violation. The City of Bayonne's potential liability for the alleged constitutional deprivations is not as easily determined as defendant suggests.

▬ The record indisputably shows that Mayor Doria, on behalf of the City of Bayonne, relinquished support for the project sometime prior to the August 18, 1999 City Council meeting where it was resolved that Bayonne would seek to release itself from the lease with AMR NJ. This public decision was made prior to the HCIA meeting. An affidavit from Ronald Klempner, one of AMR NJ's principals, states that Mayor Doria told him that defendant Bayonne changed its position because of the adverse citizen reaction to the transport of New York City garbage through the city. A fact finder could draw a reasonable inference that Bayonne's change of position, for arguably impermissible reasons, influenced the decision of the HCIA, which, arguably, would not approve the project without the support of the host city. Although Bayonne's role in the alleged constitutional violations is attenuated, on summary judgment, factual disputes regarding the link between the HCIA decision and Bayonne's conduct cannot be resolved at this time.

Furthermore, plaintiff pled a conspiracy among the defendants for the constitutional violations. This claim cannot be resolved on summary judgment. Plaintiff pointed to sufficient links among the entities from which a fact finder could draw reasonable inferences and thus conclude that the parties acted in concert to deny plaintiff's SWMP application for impermissible reasons. The viability of the conspiracy claim provides another reason for defendant Bayonne to remain in this action.

## F. Breach of Contract against Bayonne

■ The Court will not dismiss the breach of contract claims against the City of Bayonne. Bayonne announced in August, 1999 that it was seeking termination of the Lease. AMR NJ asserted in its November 3, 1999 letter to the city that it was abandoning its lease. Given these circumstances, the determination of which party breached the lease requires factual findings for a jury. The damages argument on the breach of contract claims will be addressed below.

## G. Damages and Causation for Lost Profits

If a fact finder concludes that plaintiff sustained a constitutional violation and/or a breach of contract, then the amount of damages, if any, that plaintiff incurred presents a separate question on summary judgment. In their original moving papers, the defendants touched upon the speculative nature of plaintiff's damages in arguing that plaintiff did not have a protected property interest in the proposed project. The Court concluded that this argument was misplaced to the extent that plaintiff's constitutionally protected property interest did not hinge upon demonstrable proof of future lost profits. The Court requested additional briefing on the subject of damages with the following issue in mind: whether AMR NJ's claim for damages is too speculative to permit consideration by a jury. More particularly, the Court's concern is whether the plaintiff's claim for lost future profits is too speculative, and thus is not compensable.[8]

■ On the issue of future lost profits under its section 1983 claims, plaintiff bears the burden of proving first that a particular injury it sustained—its loss of future profits—was caused by defendants' allegedly unconstitutional conduct. *See generally Carey v. Piphus*, 435 U.S. 247, 257–58, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)(noting that although 42 U.S.C. § 1983 does not expressly mention causation as an element, damages under the statute are compensable only if caused by the deprivation of a constitutional right). Second, if plaintiff establishes that this particular injury was caused by defendants' conduct, then the "level of damages is ordinarily determined according to principles derived from the common law of torts." *Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 265 (3d Cir.1995)(*abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir.2003))(internal quotations omitted). In the present case, the common law is reflected in the law of New Jersey.

The Court must first address whether plaintiff has set forth evidence from which a fact finder could conclude that defendants' conduct caused plaintiff's lost profits. Plaintiff argues that its evidence presents facts from which a reasonable juror could conclude that absent defendants' unconstitutional conduct, AMR NJ would have been the successful bidder on the NYC contract and that NYC would have proceeded with its waste management plan to use out-of-state transfer stations. Plaintiff's position is untenable. As articulated in more detail below, numerous uncertainties involved in the bidding and contract negotiation process undermine the requirement that defendants' actions, if proven, were a direct cause of the alleged lost profits.

---

8. For each of the eight counts pled in the second amended complaint, plaintiff demands "actual damages for amounts expended to date on the project" as a well as "consequen- tial damages for lost profits." On this motion, the fact and the level of damages for plaintiff's expenditures are not contested issues.

■ Plaintiff's evidence is deficient on a crucial aspect of its lost profits claim—namely, it has set forth no credible evidence that a contract with NYCDOS was pending or even reasonably probable. There is no letter of intent from NYCDOS or any statements from any person directly involved in the procurement and decision making process attesting that AMR NJ would have received the bid.[9] In fact, the evidence in the record shows that AMR NJ was not included in the top-tier of proposals, as it was one of two *non-recommended* proposers from which NYCDOS sought "best and final offers." Absent evidence of a promise, commitment, or contract from NYCDOS, the link that AMR NJ attempts to demonstrate is too attenuated to establish causation for lost profits.

Furthermore, numerous variables in the procurement, bidding, and selection process break the chain of causation necessary to support an inference that defendants' alleged conduct caused lost profits. Plaintiff offers expert opinion evidence in an attempt to bridge the causation gap. These experts opine that AMR NJ would have received the necessary financing and additional local, state and federal permits and certificates for the project. *See* Report of John Ryan, DeLascio Cert., Exhibit XX; Report of Richard T. Dewling, DiLascio Cert., Exhibit N. Drawing all legitimate inferences in plaintiff's favor on the financing and permitting questions, the Court is not persuaded that plaintiff has provided sufficient evidence on the most crucial inference—that AMR NJ would have received the bid award and a contract, and that the current New York City administration would have gone forward with the Mayor Rudolph Giuliani plan to transfer waste out of state.

■ On these significant points, plaintiff offers the expert opinion of Norman Steisel, who served in various positions in the mayoral administrations of David Dinkins and Ed Koch. Based on his experiences, he concludes, among other things, that "there is a very high probability that the AMR NJ Bayonne location would have successfully negotiated a contract with the City of New York were it not for the fact that the project was killed by Hudson County in 1999." Certification of Norman Steisel, at ¶ 24. The Court finds that Steisel's opinion is purely speculative, and is not supported by a reliable foundation. In other words, Steisel's opinion does not meet the standards embodied in Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony. The three major requirements of Rule 702 are that (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. With reference to the second requirement, an expert's opinion must be "based on the methods or procedures of science" rather than on "subjective belief or unsupported speculation." *Kannankeril v. Terminix Int'l,*

---

**9.** AMR NJ claims that Mayor Doria of Bayonne received assurance from New York City Deputy Mayor Joseph Lhota on July 6, 1999 that AMR NJ was to receive a contract. *See* Plaintiff's Brief, at p. 28–29. This proposition comes by way of a certification of Ronald Klempner, one of AMR NJ's principals. Allegedly, Doria told Klempner that Lhota informed Doria that AMR NJ was to be awarded a bid. Lhota, in deposition testimony, denies that this conversation occurred. In addition, Doria likewise does not recall that the conversation occurred. *See* DiLascio Cert., Exhibit MMM, at p. 251. Without any corroboration of Klempner's selfserving statement, the Court cannot credit this evidence as creating a triable issue of fact regarding the intent of NYSDOS to award AMR NJ the bid and a contract.

128 F.3d 802, 806 (3d Cir.1997) (citations omitted). While Steisel may have general knowledge concerning solid waste management issues in New York City and the procurement process that the City utilizes, he has no specific or personal knowledge of the bidding and procurement process for the Request for Proposals to which plaintiff responded. In this regard, his opinion is based on subjective belief only. Moreover, any testimony as to how New York City's waste management plans would have unfolded in the absence of defendants' conduct is entirely conjectural. The Court concludes that this testimony is unreliable, and thus inadmissible under Rule 702.

■ The Court also will consider whether Steisel's opinions are admissible under Rule 701, and if so, whether his opinions provide a basis from which a jury could infer lost profits causation. If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. Fed.R.Evid. 701. Rule of Evidence 701 has been construed "to permit individuals not qualified as experts, but possessing experience or specialized knowledge about particular things, to testify about technical matters that might have been thought to lie within the exclusive province of experts." *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1193 (3d Cir.1995). Specifically, Rule 701 "contemplates admission of lay opinions rationally based on personal knowledge so as to be helpful to the trier of fact," and "was primarily designed to allow lay individuals to express opinions that are in reality only a shorthand statement of facts." *Id.* The Third Circuit has acknowledged that in certain instances the admission of lay opinion has expanded beyond

the Rule's contemplated core areas "to permit lay persons to express opinions that are *not* shorthand statements of fact, so long as the personal knowledge, rational basis and helpfulness standards of Rule 701 are met." *Id.* at 1198.

In the present case, Steisel does not base his opinion on personal knowledge of AMR NJ's participation in the Request for Proposals or of NYCDOS's procurement process with respect to the marine to rail transfer station plans. He can only offer speculation as to the ultimate conclusions that he presents, as he never witnessed or participated in the Giuliani or Bloomberg administration's decisions on New York City's waste management plans. Because his opinions are based on conjecture, they lack a rational basis and personal knowledge of the procurement process. Even under the more relaxed standards of Rule 701, the Court finds Steisel's ultimate conclusions inadmissible.

Finally, the terms of the RFP militate against plaintiff's position that it would have secured a contract that would have reaped profits. A party awarded a contract under the RFP would have had to negotiate and agree upon final terms before a commitment was secured. Further, what we do know as described *supra* is that the RFP contained numerous contingencies, among which was a provision allowing NYCDOS to withdraw the RFP or to cancel the procurement effort at any time. The RFP concluded precisely in this fashion when Mayor Bloomberg announced that New York City would not utilize out-of-state processing or containerizing facilities. Given the multitude of contingencies which fell outside of the parties' control, plaintiff cannot say with a reasonable degree of certainty that it would have realized its proposed project.

For these reasons, the Court finds insufficient competent evidence from which a trier of fact could conclude that the alleg-

edly unconstitutional conduct caused plaintiff to sustain damages in the form of lost profits under plaintiff's Section 1983 and breach of contract claims. The Court need not address the sufficiency of plaintiff's evidence on the level of damages asserted for lost profits because the fact of damages is too attenuated to withstand summary judgment. This conclusion does not preclude plaintiff from pursuing damages for incidentals and expenditures that it incurred in the course of planning and proposing its project.

### CONCLUSION

The Court grants defendants' motion for summary judgment on the Fifth Amendment Takings claim. The Court denies defendants' motions on the Fourteenth Amendment substantive Due Process claim, the Commerce Clause claim, and the Section 1983 conspiracy claim. Furthermore, plaintiff's breach of contract claims likewise are not dismissed.

Finally, at trial, plaintiff is precluded from pursuing its damages claim for lost profits.